UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                        :

RONIT D. APPEL,                                    :
                                                        :

                       Plaintiff,            :
                                                         :                20 Civ. 6265 (JPC)

          -v-                                   :
                                                         :                OPINION & ORDER

HON. ESTHER HAYUT et al.,                  :
                                                         :

                      Defendants.         :
                                                         :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Ronit D. Appel, an attorney proceeding *pro se*, alleges that Defendants tortured and attempted to kill her after she "exposed massive well-documented corruption on the Supreme Court of the State of Israel" via various social media posts. Dkt. 1 ("Compl.") ¶¶ 1, 18. The Defendants in this case—the Honorable Esther Hayut, Yosef Meir Cohen, the Honorable Yael Antebi-Sharon, Meir Amir Cohen, David Kazhdan, Alisa Rubin Peled, Dr. Kenneth Davis, and Dr. Davis Reich—are various Israeli officials, a couple individuals involved in an lawsuit in Israel involving Plaintiff's apartment there, an Israeli college professor, and two doctors employed by the Mount Sinai Health System in New York. The Complaint brings two counts against all Defendants under the Torture Victim Protections Act ("TVPA"), 28 U.S.C. § 1350 note, for attempted extrajudicial killing and torture.

For reasons that follow, this case is dismissed as to the Honorable Esther Hayut, Yosef Meir Cohen, the Honorable Yael Antebi-Sharon, David Kazhdan, Alisa Rubin Peled, Dr. Kenneth Davis, and Dr. Davis Reich. The Court also finds that Meir Amir Cohen has been properly served with the Summons and Complaint.

# I. Background

## A. Facts

According to the Complaint, the facts of which are assumed true only for purposes of this Opinion, Plaintiff is a "natural person residing in Jerusalem, Israel and currently obtaining refuge at the home of her father, Norman Appel, M.D., in New York, NY." Compl. ¶ 1. The Complaint contends that Plaintiff "exposed massive well-documented corruption of the Supreme Court of the State of Israel" on June 11, 2020, and since then has been "the victim of assassination attempts as well as cyber terrorism, including, *inter alia*, terrifying implicit cyber threats regarding the imminent murder of Ms. Appel and close family members of hers, all of which were carried out, upon information and belief, by the Mossad, Israel's international intelligence agency, acting on behalf of the State of Israel." *Id.* The Complaint alleges that, "upon information and belief," all of the Defendants were involved with the torture and attempts to kill her. *Id.*

Plaintiff's allegations stem from what she considers to be a "fraudulent Israeli judicial proceeding" concerning her apartment in Israel (the "Israeli proceeding"). *Id.* ¶ 13. Two neighbors commenced the Israeli proceeding against Plaintiff in October 2019, alleging that there were leaks and dampness in the apartments underneath Plaintiff's apartment. *Id.* ¶¶ 13, 14. One of the plaintiffs in that case has since passed away, and her son, David Kazhdan, has been substituted in her place; Kazhdan now has title to his late mother's apartment, which Plaintiff contends was obtained fraudulently. *Id.* The Complaint asserts that, "[u]pon information and belief, the filing of the Lawsuit [*i.e.*, the Israeli proceeding] was planned by David Kazhdan and his son Eli Kazhdan with the intention of fraudulently securing a very significant judgment against Ms. Appel which would force her to sell her penthouse apartment in Jerusalem so that it could be purchased by David Kazhdan." *Id.* ¶ 13. The Complaint alleges that the attorney representing the plaintiffs in that case, Meir Amir Cohen, is a "convicted money launderer," and that he hired an "engineer"—who was

"not an engineer at all but, rather, a criminal"—to create a "fraudulent report" regarding the purported leaks. *Id.* ¶ 14.

The Honorable Antebi-Sharon,[1] also a Defendant in this case, presided over that proceeding. *Id.* The Complaint alleges that, "[u]pon information and belief," Inspector Antebi-Sharon is "working together with the Mossad." *Id.* ¶ 4. Plaintiff moved for Inspector Antebi-Sharon to remove herself from that case based on, "among other claims, a claim that defendant Antebi-Sharon had forged a note and a signature on said note in order to cover up corruption she committed in the Lawsuit." *Id.* ¶ 15. Inspector Antebi-Sharon declined to do so, *id.*, and Plaintiff appealed that decision to the Supreme Court of Israel, *id.* ¶ 16. The Supreme Court of Israel "dismissed Ms. Appel's appeal without adjudicating it, on the grounds that Ms. Appel had never paid the court fee, had not deposited a bond as required, and had not responded to the court's prior decision regarding its intention to dismiss her appeal because she did not pay the court fee or deposit a bond as required." *Id.* Plaintiff disputes these grounds for dismissal, contending that she (1) "made repeated attempts to pay the court fee but the court prevented her from paying the fee;" (2) "never received . . . the court's notice regarding the requirement to deposit a bond and the details of the bond;" and (3) "did in fact submit a response to the court's prior decision regarding its intention to dismiss her appeal." *Id.* She further contends that the Israeli court had not sent her the voucher to pay the court fee or any information regarding the bond she was required to deposit. *Id.* The Complaint alleges that this reflected "massive corruption committed by the Supreme Court," *id.* ¶ 17, which Plaintiff then posted about on her Facebook and LinkedIn social media accounts, *id.* ¶ 18.

---

[1] The Complaint lists the Honorable Yael Antebi-Sharon's role as Senior Supervisor of the Registration of Land in Jerusalem. *Id.* ¶ 4. Her counsel has stated that she is a Judicial Inspector in Jerusalem's Land Registration Office, "a quasi-judicial role responsible for (among other things) adjudicating real property disputes in Israel." Dkt. 84 at 1. Any dispute as to the Honorable Antebi-Sharon's title is not material to this Opinion. However, the Court adopts her counsel's use of the title "Inspector" for ease of reference.

Plaintiff alleges that she then became the target of several assassination attempts and other attacks at the hands of the Mossad. On June 11, 2020, "a hit team ambushed Ms. Appel on the Upper West Side of Manhattan, as Ms. Appel returned from a trip to the supermarket," but she "escaped." *Id.* On June 16, 2020, "a driver intentionally tried to run Ms. Appel over" on the Upper West Side neighborhood of Manhattan, New York. *Id.* ¶ 19. Then, beginning "on or about June 17, 2020," she was "victimized by an onslaught of cyber terrorism, which included, inter alia, terrifying implicit threats regarding the imminent murder of Ms. Appel and family members of hers." *Id.* ¶ 20. Plaintiff alleges that she also experienced "the spreading of false rumors that Ms. Appel is suicidal and/or mentally ill, in order to discredit Ms. Appel's claims of judicial corruption in Israel and to facilitate a murder of Ms. Appel that would be framed to appear as a suicide," which she describes as "[a]nother method of torture," that, "on information and belief," was instigated by the Mossad. *Id.* at ¶ 21. Specifically, on June 19, 2020, Peled, a faculty member at Interdisciplinary Center Herzliya, Plaintiff's alma mater, "widely spread false rumors among Ms. Appel's family, former classmates, and/or other IDC graduates, that Ms. Appel is suicidal and/or mentally ill, with the purpose of discrediting Ms. Appel and facilitating a murder that would be framed to appear as a suicide." *Id.* The Complaint alleges that Peled, "upon information and belief is a Mossad operative." *Id.*

Then, "a day or a few days" before June 20, 2020, Plaintiff "receiv[ed] a cyber threat . . . that her youngest brother and/or his pregnant wife would be murdered." *Id.* ¶ 22. Plaintiff warned her brother, and on June 21, 2020, he responded that his wife had given birth to a baby boy at Mount Sinai Hospital and "that his wife and the baby 'are doing great.'" *Id.* Then, on June 28, 2020, Plaintiff learned that the baby had health complications and was still in the hospital. *Id.* Plaintiff then sent her brother two emails warning him the baby might have been harmed at the hospital. *Id.*

One June 30, 2020, Plaintiff "received a threatening visit from what appear to have been

Mossad assassins, who arrived in a run-down van with the Mount Sinai Hospital logo, which, upon information and belief, was not a real Mount Sinai Hospital van." *Id* ¶ 23. Plaintiff reported this to Dr. Davis and Dr. Reich (the "Mount Sinai Defendants"), after which Dr. Davis stated they would "investigate immediately." *Id.* ¶¶ 23, 24.

The Complaint alleges that, "[u]pon information and belief, Dr. Davis and/or Dr. Reich were subsequently bribed, monetarily or otherwise, by the Mossad to cover up the true nature of the threatening June 30, 2020 visit by individuals in a van with the Mount Sinai Hospital logo." *Id.* ¶ 25. Plaintiff sent a follow-up email the next day, to which Dr. Reich responded, "Our investigation is ongoing and will be completed shortly. A member of our team will attempt to reach you later today." *Id.* The Complaint contends that this was "clearly indicative of a cover-up in progress." *Id.* The day after that, a representative from Mount Sinai sent Plaintiff an email confirming the van was in fact a Mount Sinai van sent to complete a wellness check, as someone had expressed concern about Plaintiff's wellbeing. *Id.* ¶ 26. The email also indicated that an employee had been attempting to call Plaintiff but she had not responded. *Id.* Again, the Complaint alleges that this was "clearly designed to cover up criminal activity." *Id.* Plaintiff asserts that, "[a]s a result of the assassination attempts on Ms. Appel and the cyber terrorism against her, for a lengthy period of time Ms. Appel did not go anywhere out of fear for her life." *Id.* ¶ 28.

Then on July 8, 2020, the plaintiffs in the Israeli proceeding moved to be awarded default judgment and to have Meir Amir Cohen appointed as receiver so they could make repairs in Plaintiff's apartment. *Id.* ¶ 29. The plaintiffs made this motion on the basis that Plaintiff had not complied with the Israeli court's order to schedule a time for Meir Amir Cohen and the engineer to enter the building during July. *Id.* Plaintiff responded that, among other things, she could not safely return to Israel because of the aforementioned torture and threats, which again she contends were, "[u]pon information and belief," carried out by the Mossad. *Id.* ¶¶ 30-32.

## B. Procedural History

Notwithstanding this case's early stage, it has an extensive procedural history. The Complaint was filed on August 10, 2020. Plaintiff names as Defendants (1) the Honorable Esther Hayut, the Chief Justice of the Supreme Court of the State of Israel, who Plaintiff contends, "[u]pon information and belief," "gave the Mossad an order to assassinate Ms. Appel immediately after Ms. Appel first publicly exposed documented massive corruption of the Supreme Court of the State of Israel on June 11, 2020," *id.* ¶ 2; (2) Yosef Meir Cohen, "the Director of the Mossad, the national intelligence agency of the State of Israel," who, "[u]pon information and belief," had knowledge of and instructed the Mossad to attempt to assassinate and conduct cyber terrorism against Plaintiff, *id.* ¶ 3; (3) Inspector Yael Antebi-Sharon, who presided over the Israeli proceeding and who Plaintiff asserts, "[u]pon information and belief, . . . is working together with the Mossad in its infliction of torture," *id.* ¶ 4; (4) Meir Amir Cohen, "who presents himself as an attorney" but is "a convicted money launderer," and, "[u]pon information and belief," is "working with the Mossad and/or aiding and abetting the Mossad in its infliction of torture," *id.* ¶ 5; (5) David Kazhdan, a mathematician, who Plaintiff contends that, again "[u]pon information and belief, is working with and/or aiding and abetting the Mossad in its infliction of torture on Ms. Appel and in its attempts to assassinate Ms. Appel by, among other things, implicitly threatening Ms. Appel with the loss of her home and her personal belongings in Israel if she does not return to Israel immediately, where she will, upon information and belief, be murdered by the State of Israel," *id.* ¶ 6; (6) Alisa Rubin Peled, a faculty member at Plaintiff's alma matter, who "[u]pon information and belief," "works for the Mossad" and acted to spread allegedly false rumors about Plaintiff, *id.* ¶ 7; and (7) the Mount Sinai Defendants, who "[u]pon information and belief," aided and abetted the Mossad by covering up the Mossad agent's use of the Mount Sinai van, *id.* ¶¶ 8-9.

On November 6, 2020, Plaintiff moved for, and received, a Clerk's Certificate of Default

against both of the Mount Sinai Defendants, Dkts. 39-42, and on November 9, 2020, Plaintiff filed a motion for default judgment against the Mount Sinai Defendants, Dkt. 43. Then, on November 24, 2020, Plaintiff filed a proposed Clerk's Certificate of Default against Kazhdan. Dkt. 48. Later that day, because it appeared that Kazhdan had not been properly served under the Hague Convention, the Court ordered Plaintiff to show cause why service was proper. Dkt. 49. On November 30, 2020, Plaintiff replied clarifying the form of service as to Kazhdan, and filed a supplemental certificate of service, Dkts. 51, 52, and the Court thereafter granted Plaintiff leave to file for another Certificate of Default as to Kazhdan, Dkt. 55. Plaintiff then moved for, and received, a Clerk's Certificate of Default as to Kazhdan. Dkts. 58, 60. Plaintiff filed for a motion for default judgment against Kazhdan on December 8, 2020. Dkt. 62.

On November 30, 2020, counsel for the Mount Sinai Defendants filed a letter requesting a conference in anticipation of filing motions to set aside the defaults and to dismiss. Dkt. 53. The Court waived its pre-motion conference requirement and allowed the parties to proceed to briefing on the motions. Dkts. 56, 61. On December 10, 2020, counsel for Kazhdan too requested a conference in anticipation of filing motions to set aside the default and to dismiss. Dkt. 67. The Court set a briefing schedule for those motions as well. Dkt. 72.

Then, on December 29, 2020, counsel for Inspector Yael Antebi-Sharon filed a letter "for the limited purpose of objecting to Plaintiff Ronit Appel's declaration that she properly served Inspector Antebi-Sharon in Israel." Dkt. 85 at 1. In that letter, counsel also stated that he represents Chief Justice Hayut and Yosef Meir Cohen (collectively, with Inspector Antebi-Sharon, the "Israeli Officials"), "neither of whom has been served by Plaintiff." *Id.* He also suggested the Court dismiss this case as to the Israeli Officials because they are immune from suit.

Meir Amir Cohen submitted a letter, dated January 5, 2021, also contesting service. Dkt. 114. On January 7, 2021, Plaintiff moved for, and received, a Clerk's Certificate of Default against

Meir Amir Cohen, Dkts. 102, 104, and that same day, Plaintiff filed a motion for default judgment against Meir Amir Cohen, Dkt. 107. Meir Amir Cohen then submitted another letter contesting service and requesting that the Court hold in abeyance his time to respond to the Complaint until all of the service issues were resolved. Dkt. 115.

On January 8, 2021, Plaintiff moved for, and received, a Clerk's Certificate of Default against Peled, Dkts. 111-113, and on January 10, 2021, Plaintiff filed a motion for default judgment against Peled, Dkt. 117. Peled too has moved to set aside the default, Dkt. 152, and to dismiss, Dkt. 157.

Now before the Court are Inspector Antebi-Sharon's letter that service was improper, which also encourages the Court to dismiss the case *sua sponte* for various reasons, Dkt. 84; Meir Amir Cohen's letters stating he was not properly served, Dkts. 114, 115; Kazhdan's motion to set aside the Clerk's Certificate of Default, Dkt. 81, and motion to dismiss, Dkt. 95; the Mount Sinai Defendants' motion to set aside the Clerk's Certificates of Default, Dkt. 82, and motion to dismiss, Dkt. 93; and Peled's motion to set aside the default, Dkt. 152, and motion to dismiss, Dkt. 157.

Also before the Court are various requests from Plaintiff, including: (1) for the commencement of criminal contempt proceedings against Erica Liu, counsel for the Mount Sinai Defendants, Dkt. 90, and David Kazhdan and his attorney, Daniel Kazhdan, Dkt. 119; (2) that the Court immediately refer David and Daniel Kazhdan, Dkt. 130, Federal Express, Dkt. 131, and Meir Amir Cohen, Dkt. 132, to the United States Attorney's Office for the Southern District of New York; and (3) for the Court to "immediately refer the State of Israel and the defendants in this action and their attorneys to the United States Department of Justice for investigation and prosecution of the State of Israel and its actors for terrorist activity on U.S. soil and in Israel," Dkt. 133.

## II. Discussion

Defendants have moved for dismissal on various bases, including foreign official immunity,

improper service, lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim. Except as to Meir Amir Cohen, who has contested service but has not otherwise moved in this action, the Court presumes that service was proper and that it has personal jurisdiction over Defendants. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 346-48 (2d Cir. 2018) (Calabresi, J., concurring) (affirming a court's power to presume personal jurisdiction and noting that it may be practical to do so in certain instances).

## A. Foreign Official Immunity

Foreign official immunity is a question of subject matter jurisdiction. *Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709, 712 (2d Cir.), *cert. denied sub nom. Weisskopf v. Jewish Agency for Isr.*, 140 S. Ct. 380 (2019). If the court determines at any time that it lacks subject matter jurisdiction, it must dismiss the action. Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety."). "[W]hen it is 'unmistakably clear' that the court lacks subject matter jurisdiction, the court can dismiss a complaint *sua sponte*." *Gosain v. Texplas India Priv. Ltd.*, 393 F. Supp. 3d 368, 373 (S.D.N.Y. 2019) (quoting *In re Indu Craft, Inc.*, 630 F. App'x 27, 29 (2d Cir. 2015)).

"[F]oreign government officials acting their official capacity, . . . are entitled to immunity." *Eliahu*, 919 F.3d at 712; *see Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (recognizing "[t]he immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority . . . as civil officers"). Although the Foreign Sovereign Immunities Act ("FSIA") does not apply to individual officials of a foreign state, a suit "may still be barred by foreign sovereign immunity under the common law." *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010).

Under the common law, courts employ a two-step procedure for assessing immunity. First,

the State Department may provide a "suggestion of immunity," pursuant to which the Court would surrender jurisdiction. *Id.* at 311-12. Second, even if the State Department does not grant a suggestion of immunity, the Court has the authority for itself to determine if immunity is proper. *Id.* In assessing any immunity of the Israeli Officials, it is not relevant that the actions allegedly taken may have been illegal under Israeli law. *Eliahu*, 919 F.3d at 713.

All of the actions alleged in the Complaint that are attributable to the Israeli Officials were plainly actions taken in their official capacities. First, Plaintiff contends that Inspector Antebi-Sharon "is working together with the Mossad in its infliction of torture on Ms. Appel and in its attempts to assassinate Ms. Appel by, among other things, implicitly threatening Ms. Appel with the loss of her home and her personal belongings in Israel if she does not return to Israel immediately where she will, upon information and belief, be murdered by the State of Israel." Compl. ¶ 4. These allegations, on their face, relate to Inspector Antebi-Sharon's role as "the judicial officer presiding over the proceeding." *Id.* ¶ 14; *see id.* ¶¶ 13-15.

Plaintiff makes one specific allegation against Chief Justice Hayut: She "gave Mossad an order to assassinate [Plaintiff]." *Id.* ¶ 2. The Court cannot conclude from this broad, conclusory statement, which is devoid of any actual factual support, that Chief Justice Hayut acted outside the scope of her official capacity. And to the extent Plaintiff's allegations about the "Supreme Court of the State of Israel" are meant to refer to Chief Justice Hayut, *see, e.g.*, ¶ 16 ("The Supreme Court engaged in criminal activity in order to not adjudicate the appeal . . . ."), this only adds support for the conclusion that any allegations against Chief Justice Hayut pertain to her official duties.

Finally, Plaintiff claims that Yosef Meir Cohen, as Director of the Mossad, had knowledge of and instructed "the assassination attempts and the cyber terrorism against [Plaintiff]." *Id.* ¶ 3. As with Chief Justice Hayut, Plaintiff has not alleged any facts to support a finding that Yosef Amir Cohen took any actions in a personal, rather than official, capacity.

Accordingly, the Court dismisses the claims against the Israeli Officials for lack of subject matter jurisdiction.

## B. Service of the Summons and Complaint

Meir Amir Cohen submitted two letters notifying the Court that, although he was not appearing this action, he was not properly served. Dkts. 114, 115. The Court will not repeat its prior rulings regarding service by mail, *see* Dkts. 49, 56, nor does it need to: Cohen's principal contention is that the Summons and Complaint were not sent in accordance with Rule 4 of the Federal Rules of Civil Procedure, which mandates that a mailing require a signed receipt. *See* Fed. R. Civ. P. 4(f)(2)(c)(ii). Specifically, Meir Amir Cohen argues that service was improper because, according to Federal Express's website, (1) the Summons and Complaint were signed for by "M. Meir" and Meir Amir Cohen does not know anyone by that name, and (2) no signature was required for delivery. Dkt. 114; *see* Dkt. 78, Exh. 2.

However, the Clerk's Certificate of Mailing reflects that, when it mailed the Summons and Complaint, it did mandate a signature. Dkt. 64. And courts in this Circuit have held that service via Federal Express, with a signature required, complies with Rule 42's "mail" requirement. *See Evriholder Prod. LLC v. Simply LBS Ltd. Co.*, No. 17 Civ. 4329 (RA) (BCM), 2020 WL 7060336, at *3 (S.D.N.Y. Apr. 21, 2020) (collecting cases). "[D]ue process requires that service be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *DPWN Holdings (USA), Inc. v. United Air Lines*, 871 F. Supp. 2d 143, 154 (E.D.N.Y. 2012) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). It is unclear from the record if Federal Express did mandate a signature, as directed, and the statement on Federal Express's website is erroneous, or if Federal Express in fact delivered the Summons and Complaint without requiring a signature. Nonetheless, the Court concludes that Plaintiff complied with the required process for

service of the Complaint, and Meir Amir Cohen undoubtably has notice of this suit, as he submitted two letters contesting service. *See* Dkts. 114, 115. Accordingly, the Court finds that service on Meir Amir Cohen was proper in this case.

## C. Motions to Set Aside the Defaults

The Court next turns to the requests by Kahzdan, Peled, and the Mount Sinai Defendants to set aside the entries of defaults against them. Rule 55(c) of the Federal Rules of Civil Procedure provides that an entry of default may be set aside for good cause. Fed. R. Civ. P. 55(c). In assessing whether there is "good cause," courts look to (1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented. *Enron v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). A court's discretion to vacate a default is "circumscribed" in scope as "a reflection of [the Second Circuit's] oft-stated preference for resolving disputes on the merits." *Id.* at 95; *id.* at 96 ( "[D]efaults are generally disfavored and are reserved for rare occasions . . . ."). Thus, "when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." *Id.*

First, there is nothing to suggest that these Defendants willfully defaulted. To be willful, a failure to respond must be more than carelessness or negligence, even gross negligence. *See Am. All. Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1993); *accord S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998). "However, 'the court may find a default to have been willful where the conduct of counsel or the litigant was egregious and was not satisfactorily explained,' such as when defendants 'failed, for untenable reasons, after defendants had "purposely evaded service for months," to answer the complaint.'" *Johnson v. N.Y. Univ.*, 324 F.R.D. 65, 70 (S.D.N.Y. 2018) (quoting *McNulty*, 137 F.3d at 739), *aff'd*, 800 F. App'x 18 (2d Cir. 2020).

Kazhdan has attested that his failure to respond was not willful, as he, a citizen of Israel, misunderstood whether he had been properly served and what to do about the Complaint. Dkt. 81,

Exh. 1 at 8. The Mount Sinai Defendants have attested that their failure to respond in a timely manner was "due to mere carelessness and negligence." Dkt. 82, Exh. 2 at 7. The Mount Sinai Defendants have provided a detailed account of how this occurred, and have explained that this was due in part to the COVID-19 pandemic, which has impacted the daily operations of the Mount Sinai Health System, including its legal department. *Id.* at 7, 8-9. Peled states that she defaulted because the Complaint was sent to a former address. Dkt. 153 at 9-16. She states that she did not become aware of the Complaint until she received the notice of a default judgment, which Plaintiff sent to her work address. *Id.* at 17. Plaintiff speculates that these defaults were intentional, *see, e.g.*, Dkt. 96, but there is simply nothing to support this.

Second, setting aside the defaults will not prejudice Plaintiff. Plaintiff moved for default almost immediately after these Defendants' time to respond had elapsed, and the Mount Sinai Defendants, Kazhdan, and Peled all promptly moved to set aside defaults entered against them. Plaintiff suggests that if the Court sets aside the defaults, "Plaintiff will likely never be able to recover her home and, without further miracles, she will almost certainly be murdered by the State of Israel or its co-conspirators before she can litigate this action to completion." *Id.* at 14. But there is a strong preference for resolving disputes on the merits, *see Enron*, 10 F.3d at 95, and given the circumstances presented, the Court will not allow Plaintiff to circumvent a resolution of her claims on their merits via the default judgment procedure. Plaintiff also speculates that, if given additional time, Defendants will fabricate evidence and "falsely depict [her] as a mentally ill person with delusional claims." Dkt. 96 at 14-15. But this conjecture does not weigh against setting aside the defaults to allow Defendants to contest this action on the merits.

Third, and finally, as the Court explains below, these Defendants have presented meritorious defenses. The Court therefore grants the Mount Sinai Defendants', Kazhdan's, and Peled's motions to set aside the defaults.

### D. Motions to Dismiss[2]

Plaintiff brings claims for attempted extrajudicial killing and torture under the TVPA. The TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation," "subjects an individual to torture" or "subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages." 28 U.S.C. § 1350 note § 2(a). Having dismissed the claims against the Israeli Officials on immunity grounds, the Court now turns to whether Plaintiff has stated a claim under the TVPA as to the remaining Defendants who have sought dismissal, *i.e.*, Kazhdan, Peled, and the Mount Sinai Defendants.

#### 1. Applicable Standard

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In

---

[2] Kazhdan also moves to dismiss for lack of subject matter jurisdiction on the basis that the claims are so without merit that there is no federal controversy. *See* Dkt. 95, Exh. 1 (citing *N.Y. Dist. Att'y. Investigators Police Benev. Ass'n v. Richards*, 711 F.2d 8, 10 (2d Cir. 1983)). "The test for determining whether federal jurisdiction exists is whether the alleged cause of action is 'so patently without merit' as to justify dismissal for lack of jurisdiction, or stated another way, whether the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *N.Y. Dist. Atty. Investigators Police Benev. Ass'n.*, 711 F.2d at 10 (quoting *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 70-71 (1978)). Kazhdan correctly notes that other Circuits have dismissed on these grounds when faced with outlandish arguments. Dkt. 95, Exh. 1 at 2 (citing *Mina v. Chester Cty.*, 679 F. App'x 192, 195 (3d Cir. 2017), and *Ling Yuan Hu v. DOD*, No. 13-5157, 2013 WL 6801189, at *1 (D.C. Cir. Dec. 11, 2013)). However, the Court concludes that under this Circuit's precedent, the purportedly fantastical nature of Plaintiffs arguments are better addressed at the Rule 12(b)(6) stage. *See, e.g., Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011).

making such determination, the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), but need not accept "legal conclusions" as true, *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic[,]' or 'delusional.'" *Gallop*, 642 F.3d at 368(quoting *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)).

Although allegations drafted by *pro se* plaintiffs are generally held "to less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *accord Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007), *pro se* attorneys cannot claim the "special consideration, . . . customarily grant[ed] to *pro se* parties," *Harbulak v. Suffolk Cty.*, 654 F.2d 194, 198 (2d Cir. 1981); *see also Banker v. Banker*, 744 F. App'x 24, 24 n.1 (2d Cir. 2018) (holding that a lawyer representing himself *pro se* "does not receive the benefit of [the] general practice of liberally construing *pro se* briefs to raise the strongest argument they suggest because he is an attorney").

### 2. Plaintiff Has Failed to State a Claim Under the TVPA

Plaintiff's claims against Kazhdan, Peled, and the Mount Sinai Defendants fail for a few reasons. First, she has not sufficiently pleaded that she was a victim of torture under the statute. The TVPA defines torture, in relevant part, as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising from or inherent in, or incidental to, lawful sanctions), whether physical or mental." 28 U.S.C. § 1350 note § 3(b)(1). "Torture under the TVPA refers to 'extreme, deliberate, and unusually cruel practices.'" *Ben-Haim v. Neeman*, 543 F. App'x 152, 155 (3d Cir. 2013) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002)).

The Complaint does not allege facts that would allow the Court to find any of the Defendants

liable for torture under the TVPA. First, the Complaint does not allege that Plaintiff was in the "custody or physical control" of any of the Defendants. Although the Complaint alleges that Defendants' actions made Plaintiff afraid and she "did not go anywhere out of fear for her life," Compl. ¶ 28, this is not equivalent to being in another's "custody or physical control." Second, the Complaint does not allege sufficient facts suggesting that Plaintiff experienced any torture. "The severity requirement is crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Price*, 294 F.3d at 92. The Complaint alleges that Plaintiff was "victimized by an onslaught of cyber terrorism, which included, *inter alia*, terrifying implicit threats regarding the imminent murder" of Plaintiff and her family. Compl. ¶ 20. But it does not provide any details as to the contents of those alleged threats. It also refers to "other torture," *id.* ¶ 3, "implicit[] threat[s]" that Plaintiff will "los[e] . . . her home and her personal belongings in Israel if she does not return to Israel immediately, where she will, upon information and belief, be murdered by the State of Israel," *id.* ¶ 6, "false rumors that Ms. Appel is suicidal and/or mentally ill," *id.* ¶ 7; *see also id.* ¶ 21, and "facilitating the provision of false information to Ms. Appel by the Mount Sinai Health System," *id.* ¶ 8. These vague, conclusory allegations are simply insufficient to state a claim for torture.

Nor is it clear that the TVPA allows for civil liability for *attempted* deliberative killing, as alleged by Plaintiff. The TVPA defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note § 3(a). It "does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id.* The TVPA further provides that an individual who subjects another to torture shall "be liable for damages to that individual," but that an individual

who subjects another to extrajudicial killing shall be "liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." *Id.* § 2(a).

Therefore, the TVPA, on its face, imposes liability for a "deliberate killing" but not an "attempted deliberate killing." Moreover, the TVPA allows an individual "subject[ed] . . . to torture" to bring a civil action for torture, but only allows the "legal representative" or "any person who may be a claimant in an action for wrongful death" to bring a civil action for an extrajudicial killing. *Id.* This necessarily assumes that the victim of an extrajudicial killing is in fact deceased. In fact, Plaintiff, as the supposed victim of an *attempted* extrajudicial killing, does not clearly have a cause of action under this provision.

There is a dearth of case law directly assessing the issue. At least one court has explicitly addressed arguments against imposing liability for attempt and allowed a claim for attempted extrajudicial killing to survive the motion to dismiss stage. *See Boniface v. Viliena*, 338 F. Supp. 3d 50, 67-68 (D. Mass. 2018) (finding the defendant "ha[d] not demonstrated" that the plaintiff's TVPA claim based on an attempted extrajudicial killing should be dismissed). But in coming to this conclusion, the court in *Boniface* relied principally on various other cases in which courts— often, if not always—*assumed* that there was attempt liability under the TVPA, without any objection from the defendant. *See, e.g.*, *Doe v. Constant*, 354 Fed. App'x. 543, 547 (2d Cir. 2009) (affirming entry of a default judgment for attempted extrajudicial killing under the TVPA). Those courts thus did not have the occasion to truly grapple with the statutory language. And while the court in *Boniface* found the defendant's argument "based entirely on the text of the statute" to be insufficient, 338 F. Supp. 3d at 67, this Court respectfully disagrees that a plain reading of statutory language cannot be enough to grant a motion to dismiss.

In support of her argument, Plaintiff also points to the court's decision in *Gill v. Islamic Republic of Iran*, which she correctly notes concluded that "the Torture Victim Protection Act's

definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt." 249 F. Supp. 3d 88, 99 (D.D.C. 2017); Dkt. 100 at 7. But the court made this finding in assessing the "terrorism exception" to the FSIA. *See Gill*, 249 F. Supp. 3d at 99. The terrorism exception provides that a foreign state is not immune from jurisdiction for actions "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A. The FSIA defines "extrajudicial killing" in that provision in accordance with the definition in the TVPA. *Id.* § 1605A(h)(7).

*Gill*, a district court case from a different Circuit, is, of course, not binding on this Court. Moreover, the *Gill* court's reliance on the FSIA, rather than the TVPA, is clear: It explicitly noted that, "[i]n reaching this conclusion, [it] [was] guided by the [District of Columbia] Circuit's direction that Congress amended the terrorism exception to 'prevent state sponsors of terrorism . . . from escaping liability for their sins,' and therefore, given the Act's 'text and purpose,' its 'ambiguities [should be interpreted] flexibly and capaciously.'" *Gill*, 249 F. Supp. 3d at 99 (final alteration in original) (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and then *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 & n.4 (D.C. Cir. 2013)). Even assuming *Gill* carries persuasive weight outside of the FSIA context, there remains tension with the plain text of the statute in extending a cause of action under the TVPA to attempted extrajudicial killing.

In the end, it is not necessary to resolve that tension because, even if the TVPA were to cover attempted killing, Plaintiff's TVPA claims against Kazhdan, Peled, and the Mount Sinai

Defendants still must be dismissed. "Any allegation arising under the TVPA requires a demonstration that the defendants acted under color of foreign law, or under its authority." *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009). Thus, "to state a claim under the TVPA, [the plaintiff] must adequately allege that the defendants possessed power under [a foreign state's] law, and that the offending actions . . . derived from an exercise of that power, or that defendants could not have undertaken their culpable actions absent such power." *Id.*; *see also Chowdhury v. Worldtel Bangl. Holding, Ltd*., 746 F.3d 42, 52-53 (2d Cir. 2014) ("[F]or purposes of the TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid." (quoting *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 260 (2d Cir.2007) (per curiam), *aff'd for want of a quorum sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008))).

Plaintiff's theory is that she had a dispute over on an apartment in Israel, which led to a widespread conspiracy on behalf of the State of Israel to murder her. *See, e.g.*, Compl. ¶ 14. As to Kazhdan, the Complaint alleges that he assisted the Mossad by "implicitly threatening Ms. Appel with the loss of her home and her personal belongings if she does not return to Israel immediately." *Id.* ¶ 6. But the Complaint does not allege any facts about what these "implicit" threats are, beyond the existence of the Israeli proceeding and actions taken therein, or anything else that would allow the Court to conclude that Kazhdan took any action were on behalf of the Mossad. The Complaint further speculates that Kazhdan was working with Israeli officials to "criminally extort money from Ms. Appel herein and to criminally obtain control over her Jerusalem apartment." *Id.* ¶ 14. But again, the Complaint does not allege any facts to support this. Conclusory allegations of participation in a conspiracy are insufficient to state a claim. *See X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999).

Plaintiff asks the Court to infer that the Mount Sinai Defendants also colluded with the Mossad. Compl. ¶ 18. But there is simply nothing in the Complaint to support this. First, the

Complaint alleges that Plaintiff emailed her brother after his newborn son had health complications at a Mount Sinai hospital, warning him that the baby may have been harmed at the hospital. *Id.* ¶ 22. There is nothing in the Complaint to suggest that her brother took these suspicions seriously or acted upon these emails. Nor is there anything to suggest that Mount Sinai, the Mossad, or any of the other Defendants somehow had access to these emails or to suggest that they did anything to harm Plaintiff's nephew. Second, the Complaint points to a "threatening visit" from individuals in a Mount Sinai van. *Id.* ¶ 23. The Complaint asks the Court to infer that, based on Plaintiff's impression that it was a "run-down van," these were Mossad assassins. *Id.* The Complaint also asks the court to infer, based on Mount Sinai's two-day delay in confirming to Plaintiff that it was in fact a Mount Sinai van, that the Mount Sinai Defendants were bribed by the Mossad to participate in a cover-up. *Id.* ¶¶ 24-27. But the Court need not give weight to such speculative allegations. *See Gallop*, 642 F.3d at 368 ("While, as a general matter, Gallop or any other plaintiff certainly may allege that the most senior members of the United States government conspired to commit acts of terrorism against the United States, the courts have no obligation to entertain pure speculation and conjecture."). The Complaint simply does not contain sufficient facts that would allow the Court to draw a reasonable inference that this van was anything other than what Mount Sinai allegedly told Plaintiff it was—a van sent pursuant to a wellness check.

Finally, the Complaint alleges that Peled "works for the Mossad," and "is a Mossad operative." Compl. ¶¶ 7, 21. But it does not allege *any* facts supporting these assertions.

In sum, the Complaint does not allege any non-conclusory facts to support a reasonable inference that Kazhdan, Peled, or the Mount Sinai Defendants acted upon actual or apparent authority, or color of law, of the State of Israel.

### III. Conclusion

For the reasons stated above, Plaintiff's Complaint is dismissed as to all Defendants except

Meir Amir Cohen. Specifically, this case is dismissed *sua sponte* for lack of subject matter jurisdiction as to the Honorable Esther Hayut, Yosef Meir Cohen, the Honorable Yael Antebi-Sharon. David Kazhdan's, Alisa Rubin Peled's, and Dr. Kenneth Davis and Dr. David Reich's motions to set aside the defaults entered against them and to dismiss for failure to state a claim are granted.

The Court concludes that Meir Amir Court was properly served with the Summons and Complaint. Accordingly, Meir Amir Cohen shall have until July 30, 2021 to move to vacate the default. He may move to do so via letter-motion, should he so choose.

Finally, the Court concludes that Plaintiff's requests (1) for the commencement of criminal contempt proceedings against Erica Liu, counsel for the Mount Sinai Defendants, Dkt. 90, and David Kazhdan and his attorney, Daniel Kazhdan, Dkt. 119; (2) that the Court immediately refer David and Daniel Kazhdan, Dkt. 130, Federal Express, Dkt. 131, and Cohen, Dkt. 132 to the United States Attorney's Office for the Southern District of New York; and (3) for the Court to "immediately refer the State of Israel and the defendants in this action and their attorneys to the United States Department of Justice for investigation and prosecution of the State of Israel and its actors for terrorist activity on U.S. soil and in Israel," Dkt. 133, are frivolous and without a basis in fact or law. Accordingly, the Court denies each of those requests.

The Clerk of the Court is respectfully directed to terminate the motions pending at Docket Numbers 43, 62, 81, 82, 84, 86, 88, 90, 93, 95, 117, 119, 125, 152, and 157. The Clerk of the Court is further directed to mail a copy of this Opinion and Order to Meir Amir Cohen at the address listed in Docket Number 64.

SO ORDERED.

Dated: June 30, 2021
     New York, New York

                              JOHN P. CRONAN
                       United States District Judge